MISSOURI PACIFIC TRANSPORTATION COMPANY *v.* SACKER.

4-5831 and 4-5854 (consolidated) 138 S. W. 2d 371

Opinion delivered March 18, 1940.

*Rose, Loughborough, Dobyns & House,* for appellant.

*Glover & Glover, Kenneth C. Coffelt* and *Fred A. Isgrig,* for appellees.

MEHAFFY, J. About six o'clock on the evening of February 11, 1939, one of appellant's buses was coming from Hot Springs to Little Rock. The bus, before reaching William's Creek, west of Benton, and just after coming around a curve and getting into the straight road, passed an automobile driven by appellee, J. C. Oates. After the bus passed the car driven by Oates, and got immediately in front of it, it stopped suddenly and the Oats' car ran into the back end of the bus and injured certain parties and damaged the automobile.

Mrs. Stanley H. Sacker alleged in her complaint that the highway crosses a bridge over William's Creek about seven miles southwest of Benton; that approximately 100 feet southwest of the bridge, the bus, traveling at a reckless rate of speed, passed an automobile going in the same direction as the bus, and immediately after passing said automobile, said bus was negligently brought to a sudden stop upon the highway and thereby caused the automobile to run into the bus; that the bus driver was negligent in traveling at a reckless rate of speed at a place on the highway where he knew he might have to stop suddenly, and in stopping without warning on the highway, when he knew, or should have known that the driver of the car in the rear could not, himself, stop before colliding with the bus, and in stopping on the highway without leaving 15 feet on the opposite side of the highway. Plaintiff's vertebrae of her neck is dislocated, causing a pinching of the nerves in that area and a shock to her nervous system and the muscles and ligaments of her neck were bruised and torn and she has been damaged in the sum of $3,000.

The complaint of J. C. Oates alleges that he was driving about 40 miles an hour and that the bus was traveling 50 or 60 miles an hour, and makes the same allegations as to negligence as are in the complaint of Mrs. Sacker. He also sues for $3,000.

Stanley H. Sacker filed a complaint alleging the same negligence as Mrs. Sacker's complaint, and prayed for $3,000 damages for expenses and *consortium*.

The complaint of the Southern Mattress Company alleged that it was the owner of the car driven by J. C. Oates, and alleged the same negligence as alleged in the other complaints.

Exhibit "A" to the complaint of the Southern Mattress Company is a statement of the costs of repairing the automobile, in the amount of $438.66.

The appellant filed motion to quash in the cases brought by Sacker and Mrs. Sacker alleging that at no time material to the complaint had it kept or maintained in Saline county any branch office or other place of business or agent upon whom service of summons could have been had. It was alleged that service was not had upon any agent of the appellant. The motions to quash were overruled.

Appellant filed answer in the case brought by Mrs. Sacker containing a general denial, and further alleging that it acted in a sudden emergency not induced by any negligence on its part. Defendant's driver stopped the bus in order to avoid an imminent collision with an approaching bus; otherwise both buses would have met on the bridge, which was too narrow for them to pass in safety, and said bus was run into negligently by Oates. Appellant filed answer in the Stanley H. Sacker case, and the allegations were similar to those in the Mrs. Sacker case.

The answer in the J. C. Oates case was a general denial and it alleged negligence on the part of Oates in driving fast without keeping a proper lookout ahead of him, and without proper lights or adequate brakes, and in following the bus too closely. It alleged the same emergency as alleged in the Sacker case, and that a proper signal was given before it stopped.

The answer in the Southern Mattress Company case was a general denial and an allegation of negligence on the part of Oates. It further alleged negligence on the

part of the Southern Mattress Company in furnishing a car to Oates with inadequate brakes, and the same allegations as in the answers in the other cases.

There was a verdict and judgment for Mrs. Sacker in the sum of $2,750; in favor of Mr. Sacker for $500; in favor of J. C. Oates for $500; and in favor of the Southern Mattress Company for $200.

Appellant filed motion for a new trial, which was overruled, and filed an amendment to the motion for new trial, which was also overruled. Evidence was then taken on the motion to quash. The case is here on appeal.

Taylor Roberts, a witness, testified in substance as follows: That on the evening of February 11, 1939, J. C. Oates and witness were on their way back from Lake Hamilton to Little Rock; witness was in Oates' car; Williams' Creek is seven miles on the west side of Benton; there is a curve from 500 to 700 feet on the west side of the creek; before the collision, they were traveling 35 or 40 miles an hour and were on the right side of the highway; just as they were getting out of the curve on the west side of William's Creek the appellant's bus overtook and passed them; when it got within 150 feet of the bridge, the bus suddenly stopped without warning; it had been going considerably faster than the car witness was in; at the time, witness and Oates were possibly 25 or 30 feet behind the bus, and it happened so suddenly that he is unable to say whether its signal lights flashed or not; as a result of the sudden stop, the car witness was in ran into the rear end of the bus. The bus stopped 150 feet from the bridge; there was no reason why it could not have stopped more gradually and nearer the bridge; after William's Creek is crossed going east, the road curves back to the right and makes an "S" curve; the bus was going between 50 and 60 miles an hour when it passed witness' car; they were out of the curve when it passed, probably 30 yards; from the curve to the bridge, the highway is 18 feet wide; the bridge is a foot wider than the highway; witness saw Mr. Oates after the accident; his face was bandaged and bandages on his side extending across his back; he

had a cut over his left eye and was complaining of injuries to his knee; he lost some time from his work; witness was rendered unconscious and knows nothing about what skid marks or glass were left on the highway at that time; there is about 50 yards of straight road on the east side of the bridge; this accident occurred on straight road between the curves; both the bus and witness' car had the lights on; does not know whether the stop lights flashed because he threw up his hands to protect himself; from the time the bus passed witness' car until the accident, it traveled about 50 yards. There was then a statement made by witness, which was introduced in evidence on cross-examination. In that statement he said that the bus had come to a stop, and the stop was so sudden that they were not more than 25 feet behind him; it was dark enough to have lights on; Mr. Oates applied his brakes, but was unable to stop within that short notice, and they struck directly in the back of the bus; witness was knocked unconscious and did not regain consciousness until he was in the office of Dr. Gann at Benton, and he was sewing up witness' forehead at the time; was taken to Dr. Gann's office by Mr. Spatz of the Missouri Pacific Lines. Witness then tells about his own injuries and says the car they were in was a 1938 Ford V-8; Mr. Oates and witness were talking as they came from Hot Springs and had not been driving fast; witness is a lawyer, and before he signed this statement, made some changes.

Dr. Hundling testified that he saw Mr. Oates on the morning of February 12th, the day after the accident, and he was suffering a good deal of pain. Dr. Hundling then testifies at length as to the extent of Mr. Oates' injuries.

J. C. Oates, one of the appellees, testified substantially the same as Taylor Roberts, and says that he saw the lights of another car coming after the bus had passed them, and if he had not seen this he would have cut around to the left; he could not go to the right because the road was built on a dump; there was nothing to hinder the bus from going on up to the bridge; there are 675

feet of straight road on the Hot Springs side of the bridge and 150 feet of straight road on the Benton side; the bus was standing absolutely still when he ran into it; witness said in rounding a curve on the highway about seven miles southwest of Benton, a Missouri Pacific Transportation bus passed them going in the same direction; witness was driving the car and when the bus pulled up along side of the witness' car, he saw it was a bus and dimmed his lights; did this in order to see the edge of the road clearly so that he could keep over as far to the right as possible to give the bus clearance; he was driving about 40 miles an hour; the bus was going at a speed which would be the normal speed to pass someone; after the bus passed it pulled back to the right side of the road, and about the time it had gotten wholly back on the right side of the road, the driver applied his brakes, and came to a quick stop; naturally assumed that the bus that had just passed them would keep going; when he noticed that it stopped, he put on his brakes; heard the air brakes of the bus "hiss" and saw the bus "hump up" by the sudden putting on of the brakes; does not know whether the stop lights flashed on; after he hit the bus things "went black" and he does not remember getting out of the car; there was a crowd of people standing around; he was put into a car and driven home and his wife called Dr. Saxon; was suffering considerable pain; his left knee was bruised and badly swollen on Sunday morning; chest so sore he could not turn over, at noon had a fever of 101 degrees; had never been injured in an automobile accident; is a traveling man and drives from 40,000 to 50,000 miles a year; never had a law suit.

There is no complaint at the size of the verdict in the Oates case, and further evidence of his injuries will not be set out.

Thomas Posey, a witness, testified in substance as follows: He had worked on the car Oates was driving, tightened the brakes and they were in good shape; tested them himself.

Mrs. Stanley H. Sacker, appellee, testified that she was married to Stanley H. Sacker; they have no chil-

dren, but are raising three orphan children; she was a passenger in the bus and was sitting about the center on the right side; when the bus was going really fast, it passed a car and then stopped suddenly and then this impact from the rear was almost instantly; the impact caused a jerking sensation that jerked her back in her seat; something snapped in the back of her neck; it was very painful; she stepped off the bus and stepped down to the earth; it was level; when she got home she telephone Dr. Straus, but was unable to get him and called Dr. May; since then she has had a terrible lot of pain in the back of her neck, running into her left arm; her left arm is numb and tingles, and her fingers draw and cramp at times; before the accident she was in perfect condition; has been under the care of Dr. May ever since; is suffering pain at the present; pains her to move her head; her neck is stiff; she has lost weight; before the accident she would walk from a mile to a mile and a half every day, but cannot do it now; her condition is growing worse; her mother, father and three children live in the home with her; the children are her nieces and nephews; is able to go to the doctor's office; given a statement; she testified that she did not remember signing it, but that was her signature; she had never read the statement; the statement says: ''Neither my husband nor I have ever had a claim, and that is correct.''

Appellee Stanley H. Sacker testified in substance that his wife was 38 years old and he was 48; had been married 18 years; was in new Orleans at the time his wife was injured; found her in bed when he got home; witness was formerly a lieutenant in the Navy; has been retired to inactive duty; his wife belonged to the Army & Navy Womens Club and to the physical culture class and the P. T. A.; has to pay the maid extra and the drug bill is around $80; her condition is very bad; is a naval officer and subject to call and may have to go away at any time.

Dr. May testified at length about her injuries and about treating her, and among other things said that her mind did not seem exactly right; his bill is from

$250 to $300. Dr. May, after he had made his examination, gave a report of the findings to the bus company.

There was evidence as to the damages to the automobile, but there is no controversy about the amount awarded for damage to the automobile.

The evidence of some of the appellant's witnesses contradicted some of witnesses for appellees. We have many times held that in determining whether the evidence is sufficient to support a verdict, the testimony must be viewed in the light most favorable to the appellee, and if thus viewed, there is substantial evidence supporting the verdict, it cannot be disturbed on appeal. We have also held that in determining the sufficiency of the evidence to go to the jury, this court will consider appellee's evidence alone, and if there is substantial evidence to support the verdict, it will not be disturbed, although the appellant's evidence is in conflict with that of appellee. *Baldwin* v. *Wingfield*, 191 Ark. 129, 85 S. W. 2d 689; *Coca-Cola Bottling Co.* v. *Hill*, 192 Ark. 154, 90 S. W. 2d 210; *Roark Trans. Co.* v. *Sneed*, 188 Ark. 928, 68 S. W. 996; *Fries* v. *Phillips*, 189 Ark. 712, 74 S. W. 2d 961.

Appellant first contends that no allegation of negligence was proved, and that a verdict should have been directed for the appellant. Appellant's bus, shortly after it came out of the curve west of William's Creek, passed the car driven by Oates, and shortly thereafter discovered a bus approaching from the east, just east of the bridge, and suddenly applied the brakes and stopped the bus about 150 feet before reaching the bridge. Appellees' witnesses testified that the driver of the bus did not come to a gradual stop, but stopped suddenly, and they did not see the stop lights. The evidence shows that it stopped so suddenly that the flash lights went on at the same time that the bus stopped. The bus, according to the appellees' evidence, was traveling about 50 or 60 miles an hour when it passed the car driven by Oates, which was traveling about 40 miles an hour. The driver of appellant's bus says that when he reached the point where he could see across the bridge, he saw this other

bus approaching and stopped his bus because the rules of his company prohibited him from passing a car on a bridge. It, therefore, became necessary, according to his testimony, for him to stop the bus. There is evidence introduced by appellant tending to show that the bus made the usual stop. The evidence of appellees, however, shows that it cut in front of the Oates car and stopped suddenly, without warning.

"It is the duty of a motorist if he knows, or by the exercise of ordinary care can know, that another car is close behind him to warn the approaching car by some appropriate signal or gesture of his intention to stop his car, and the sudden stopping of a car without any notice to the driver of the car immediately behind, if unexplained, is negligence." Vol. 1, Blashfield's Cyclopedia of Automobile Law and Practice, 511.

The bus was traveling at a rapid rate of speed, passed the other car, and the driver of the bus knew that the other car was immediately behind him. Notwithstanding this knowledge, and notwithstanding there was a bus approaching from the other direction, so that the car behind could not go to its left, suddenly stopped on the highway in front of the other car, when it was impossible for it to stop without striking the bus.

It is contended that the driver of the bus gave the warning required by statute; but the warning was given when he stopped and not before he stopped. It would have been an easy matter to have applied the brakes gradually and put the stop lights on soon enough for the driver of the car behind the bus to have seen the lights in time to stop before hitting the bus. Instead of giving the warning before stopping, he stopped suddenly when he still had 150 feet between him and the bridge, and certainly could have gone to the end of the bridge without danger of collision with the other bus. The bridge was as wide as the road; in fact, it was one foot wider.

Appellant cites and relies on *Lockhart* v. *Ross,* 191 Ark. 743, 87 S. W. 2d 73, and states that this case holds that the driver of an automobile must keep his car under such control as to be able to check its speed or stop, if

necessary, to avoid injury when danger is apparent. In the instant case no danger was apparent, and there was no reason to anticipate danger until it was too late to avoid the collision. In the Lockhart case it was also stated that the evidence was in conflict, and that it was a question for the jury.

This accident occurred on the Hot Springs-Little Rock highway a few miles west of Benton, and just west of the bridge across William's Creek. There is probably no road in Arkansas more traveled than this road. The driver of the bus knew this, and knew that he might meet other motor cars at any time. He also knew when he passed the Oates car that he was close to the bridge; and notwithstanding this knowledge, he passed the Oates car going 50 or 60 miles an hour after he had passed the curve about 30 feet, and then discovering what he might have anticipated, that there was another motor car approaching, and knowing that the rules of his company prohibited his passing motor cars on a bridge, he suddenly and without giving any warning beforehand, applied his brakes so as to stop at once, and was still 150 feet from the bridge. Whether this was negligence or not, was a question for the jury.

It was said by the Texas court: "Our question is this: Is it negligence, as a matter of law, to drive an automobile on a paved highway in the daylight during a rain at the rate of 30 to 35 miles an hour within 40 feet of another automobile proceeding in the same direction at the same rate of speed?" *Southern Ice & Utilities Co.* v. *Richardson*, 60 S. W. 2d 308.

In the case of *Slate* v. *Witt*, 188 Ky. 133, 221 S. W. 217, the Kentucky court said that there was no complaint of the instructions, it being conceded that they admirably presented the law of the case, and one of the instructions stated as follows: "It was the duty of plaintiff on the occasion complained of, if she knew or by the exercise of ordinary care could have known that defendant's car was close behind her car to warn defendant by some appropriate signal or gesture that she intended to stop her car, and if the jury believed from the evidence that on

the occasion complained of plaintiff knew, or by the exercise of ordinary care could have known, that defendant's car was traveling close behind her own car, and stopped said car without sign or signal, and defendant's car ran into plaintiff's car by reason thereof, then they will find for the defendant.''

Appellant next calls attention to the case of *Madison-Smith Cadillac Co.* v. *Lloyd,* 184 Ark. 542, 43 S. W. 2d 729, which holds that the driver of the following car is bound to take notice and bring his car under control. The court also said in that case: ''There was no necessity whatever for them to act hastily in order to avoid striking the Hudson car. They had control of their car, but rather than reduce their speed and stop if necessary, they deliberately chose to maintain their speed, and by doing so assumed the hazard of turning to the left and passing the Hudson car.''

Appellant also cites and relies on *Schlosberg* v. *Doup,* 187 Ark. 931, 63 S. W. 2d 337, and appellant quotes from said decision: ''Under such circumstances, the driver of the car behind must take notice of the signal and bring his car under control accordingly.''

Under what circumstances? The court states in that case: ''All the witnesses agree that the truck was traveling very slowly, and that a signal warning was given that might have meant any one of four things: (1) That he would turn to the left, (2) turn to the right, (3) slow down, and (4) stop.'' Then follows the quotation copied by appellant in this case.

Appellant calls attention to other cases, but the facts in none of them are similar to the facts in the instant case, and they, therefore, have no application.

Whatever emergency there was, it was created by the appellant, and whether appellant's driver was guilty of negligence, was a question of fact for the jury. The jury saw the witnesses, heard them testify, and had an opportunity to observe their demeanor on the witness stand, and were better able to judge whether they were telling the truth than persons who simply read the printed record.

Appellant contends that the court erred in admitting the testimony of Dr. May, but we think that the question of this testimony's admissibility was for the trial court, and we cannot say that he abused his discretion.

· This court said in the case of *McDonough* v. *Williams*, 86 Ark. 600, 112 S. W. 164: "The question whether a witness has shown sufficient knowledge concerning the value of property to give him a definite opinion on the subject is a matter, to some extent, within the sound discretion of the trial judge, and this court will not reverse for alleged error in this respect unless an abuse of such discretion appears."

This court said: "The jury were capable of determining, and it was within their province to determine, the weight that should be accorded to the opinions of the witnesses, and we do not think there was any abuse of the discretion of the trial court in permitting the estimates of the witnesses and the reasons therefor to be submitted to the jury, or that any prejudicial error was committed in the introduction of the testimony." *Ft. Smith & Van Buren Dist.* v. *Scott*, 103 Ark. 405, 147 S. W. 440.

We do not think there is any merit in appellant's motion for a new trial for newly-discovered evidence.

We have carefully examined the instructions requested, given and refused, and have reached the conclusion that the jury was correctly instructed by the trial court, and no error was committed in giving or refusing instructions.

The appellant contends that the verdicts in the Sacker cases are excessive. The court is of the opinion that this contention should be sustained, and that there is not sufficient evidence to support a verdict in the case of Mrs. Sacker for more than $1,250 and in the case of Mr. Sacker for more than $250.

If the appellee, Mrs. Sacker, will enter a remittitur down to $1,250, the judgment in her favor for that amount will be affirmed; otherwise it will be reversed and remanded for a new trial. If Mr. Sacker will enter a remittitur down to $250, the judgment in his favor for that amount will be affirmed; otherwise it will be reversed and remanded for a new trial.

The judgments in favor of the Southern Mattress Company and J. C. Oates are affirmed.